UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| RICHARD RININGER | ) | Case No. 3:19-cv-2281 |
|  | ) |  |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
|  | ) |  |
| -vs- | ) | MAGISTRATE JUDGE |
|  | ) | CARMEN E. HENDERSON |
| ANDREW SAUL, Commissioner of | ) |  |
| Social Security, | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |
|  | ) |  |

## I.      Introduction

Plaintiff, Richard Rininger, seeks judicial review of the final decision of the Commissioner

of Social Security, Andrew Saul, denying his application for disability-insurance benefits and

supplemental-security income under Titles II and XVI of the Social Security Act. This matter is

before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the administrative law judge

("ALJ") applied proper legal standards and reached a decision supported by substantial evidence,

I recommend that the Commissioner's final decision denying Rininger's application for disability-

insurance benefits and supplemental-security income be AFFIRMED.

## II.      Procedural History

Rininger applied for disability-insurance benefits on December 28, 2016, for a period of

disability beginning on January 14, 2016.[1] (Tr. of Proceedings before the Soc. Sec. Admin., ECF

---

[1] Rininger filed a claim under Titles II and XVI on June 12, 2014. (ECF No. 12 at 163). The State Agency denied the claims and an ALJ decided them unfavorably on January 20, 2016. (ECF No. 12 at 163, 178). As the Commissioner notes, the unfavorable decision precluded Rininger from seeking benefits for any period that predated the January 20, 2020 decision. (ECF No. 19 at 1-2 (citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997)).

No. 12 at 337). Rininger then applied for supplemental-security income on January 18, 2017, also for a period beginning on January 14, 2016. (ECF No. 12 at 339). The Ohio Division of Disability Determination (the "State Agency") initially denied his claims on February 16, 2017 (ECF No. 12 at 190-214), and again at the reconsideration stage on May 17, 2017. (ECF No. 12 at 217-42). ALJ Paul Sher held a hearing on June 14, 2018, and Rininger and vocational expert Joanne Pfeffer testified. (ECF No. 12 at 106-59). The ALJ issued his unfavorable decision on August 21, 2018. (ECF No. 12 at 20-36). On October 5, 2018, Rininger asked the Appeals Council to set aside the ALJ's decision. (ECF No. 12 at 12-16). The Appeals Council denied Rininger's request on August 21, 2019. (ECF No. 12 at 6-11). This appeal followed. (ECF No. 1).

### III.  Background

#### A.  Relevant Medical Evidence

##### 1.  Physical Medical Evidence

Rininger sought treatment from Jeremy Mashburn, D.O., on May 18, 2016, for back and hip pain. (ECF No. 12 at 573). Mashburn characterized Rininger's back pain as a recurrent problem with aching, burning, shooting, and stabbing pain that radiates from the right to the left thigh. (ECF No. 12 at 574). Mashburn noted "tenderness to palpitation of the lumbar and thoracic paraspinal musculature bilaterally." (ECF No. 12 at 577). He also noted that Rininger had normal range of motion and no neck pain, joint swelling, or gait problems. (ECF No. 12 at 577). On January 17, 2017, Mashburn noted that Rininger was "negative for … back pain, gait problem[s], joint swelling, … neck pain and neck stiffness" when he sought treatment. (ECF No. 12 at 589).

During a November 3, 2017 visit, Mashburn noted that Rininger's back pain was chronic, moderately painful, located in the lumbar spine, and described as cramping and aching. (ECF No. 12 at 690). Rininger denied abdominal pain, leg pain, numbness, paresthesia, tingling, or

2

weakness. (ECF No. 12 at 690). Despite the pain, Rininger had no gait problems, joint swelling, neck pain, or neck stiffness. (ECF No. 12 at 693). He also had normal range of musculoskeletal motion, normal strength, and no deformities; his lumbar area, however, was tender and painful with spasms. (ECF No. 12 at 694). Mashburn referred Rininger to physical therapy and pain management services. (ECF No. 12 at 697).

Joshua Goldner, M.D., treated Rininger as a pain-management referral on December 5, 2017. (ECF No. 12 at 767). At that visit, Goldner noted that Rininger had

> very mild diffusely tender in the cervical and lumbar paraspinal muscles. [His r]ange of motion of [his] cervical spine is limited secondary to pain. Extension worsens the pain. There is pain with facet loading bilaterally in the cervical spine as well as bilateral lower lumbar spine… Shoulders and hips show good range of motion without pain.

(ECF No. 12 at 767).

Rininger appears to have begun physical therapy on December 8, 2017,[2] with licensed physical therapist Melinda DePolo. (ECF No. 12 at 751). DePolo noted that Rininger's upper-extremity strength was within functional limits; his lower extremities had limited bending ability; his thoracic and lumbar regions were not tender to palpitation; he had minimal tenderness and muscular tightness at the cervical and upper thoracic musculatures; he had normal coordination; and he ambulated slowly but without an assistive device. (ECF No. 12 at 746-48).

DePolo assessed Rininger's physical functional capacity on January 28, 2018. (ECF No. 12 at 723-43). DePolo's comprehensive assessment detailed Rininger's medical history with back and neck pain that stemmed from prior motor-vehicle accidents; a bone stimulator in his leg after

---

[2] Rininger's brief states that he began a course of physical therapy for his neck, back, and hips in December 2016. (ECF No. 16 at 5). Although Rininger cites to various pages of the record (Trr. 741, 744, 751, 753, 755, and 757), each reflects a treatment date on or after December 2017.

it healed poorly from being broken; and his recent treatments like pain management, physical therapy, and a TENS unit. (ECF No. 12 at 725-26). The assessment showed that Rininger was unable to sit, stand, crouch, crawl, stoop, or kneel for normal periods of time. (ECF No. 12 at 724-25). Rininger walked for 3 minutes and 45 seconds before needing a break. (ECF No. 12 at 725). He could carry and lift less than ten pounds occasionally from the floor to his knuckle; he could lift up to thirteen pounds from his waist to his shoulders. (ECF No. 12 at 725). Rininger struggled to sit for longer than 30 minutes. (ECF No. 12 at 736). Tests showed that Rininger struggled to maintain fine motor coordination; Rininger "verbalized frustration and also continued the test after the stop command" was called. (ECF No. 12 at 738).

Goldner assessed Rininger again on February 7, 2018. (ECF No. 12 at 787). The physical examination showed

> no acute distress … limited range of motion of the cervical and lumbar spine secondary to pain. There is facet loading in the cervical and lumbar region. Hips show pain with range of motion as well. He ambulates with a normal gait. There is intact strength throughout the bilateral upper and lower extremities.

(ECF No. 12 at 787). Goldner noted that recent cervical and lumbar spine x-rays showed "degenerative changes in the facet joints in the cervical spine with mild degenerative disc disease in the mid to lower cervical region. In the lumbar spine[,] there is degenerative disc disease noted as well as facet hypertrophy in the lower lumbar spine." (ECF No. 12 at 787).

Goldner administered medial branch blocks to Rininger's bilateral L3/4, L4/5, and L5/S1 facet joints with fluoroscopic guidance on February 12, 2018. (ECF No. 12 at 788). Rininger reported that the medial branch blocks were not as successful as he had hoped when he visited Goldner on March 7, 2018. (ECF No. 12 at 790). On March 27, 2018, imaging results showed "small anterior and posterior marginal stroke spurs off the vertebral bodies" at the C5/C6 area,

which showed interspace narrowing. (ECF No. 12 at 780). They also showed "posterior central disc herniations, with mild to moderate indentation of the dural sac anteriorly. The extradural defect is in proximity to[,] but does not impinge upon[,] the adjacent cervical spinal cord. There is mild constriction of the spinal canal, but no significant focal spinal canal stenosis. … Except as noted at C5-C6, the cervical spinal canal and neural foramina are unremarkable." (ECF No. 12 at 780).

### 2. Psychological Medical Evidence

Rininger treated his psychological impairments primarily with Kelly Sprout, M.D., at Firelands Counseling. On February 4, 2016, Sprout noted that Rininger's sleep had been poor—it took him several hours to fall asleep. (ECF No. 12 at 851). His appetite and energy were low. (ECF No. 12 at 851). His concentration was poor. (ECF No. 12 at 851). He denied suicidal or homicidal ideations, intents, or plans. (ECF No. 12 at 851). He had no auditory or visual hallucinations, but continued paranoia. (ECF No. 12 at 851). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 851). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 851). His thoughts were goal directed. (ECF No. 12 at 851). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 851).

After a March 17, 2016 visit, Sprout noted that Rininger continued to have some mood swings and experienced periods of being very down. (ECF No. 12 at 853). He was sleeping better and his appetite was ok, but he experienced some nausea related to his medications. (ECF No. 12 at 853). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 853). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 853). His thoughts were goal directed. (ECF No. 12 at 853). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 853).

After a May 5, 2016 visit, Sprout noted that Rininger was "[d]oing ok." (ECF No. 12 at 660). He was experiencing some mood swings, but had no suicidal or homicidal ideations, intents, or plans. (ECF No. 12 at 660). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 660). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 660). His thoughts were goal directed. (ECF No. 12 at 660). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 660).

After a June 16, 2016 visit, Sprout noted that Rininger was experiencing increased depression. (ECF No. 12 at 662). He also had some auditory (but no visual) hallucinations and some paranoia. (ECF No. 12 at 662). He had no suicidal or homicidal ideations, intents, or plans. (ECF No. 12 at 662). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 662). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 662). His thoughts were goal directed. (ECF No. 12 at 662). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 662).

After a September 1, 2016 visit, Sprout noted that Rininger continued to have depression and anxiety. (ECF No. 12 at 859). His sleep had been interrupted lately. (ECF No. 12 at 859). Rininger denied auditory or visual hallucinations, but he had paranoia. (ECF No. 12 at 859). His energy was okay, but his concentration was poor and his appetite was low. (ECF No. 12 at 859). He had lost about 20 pounds recently. (ECF No. 12 at 859). He had no suicidal or homicidal ideations, intents, or plans. (ECF No. 12 at 859). He experienced no side effects from his medications. (ECF No. 12 at 859). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 859). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 859). His thoughts were goal directed. (ECF No. 12 at 859). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 859).

6

After a November 3, 2016 visit, Sprout noted that Rininger continued to have mood swings and anxiety. (ECF No. 12 at 864). He was sleeping about 7.5 hours per day. (ECF No. 12 at 864). His appetite and energy were ok, but his concentration was poor. (ECF No. 12 at 864). He had no suicidal or homicidal ideations, intents, or plans. (ECF No. 12 at 864). He denied any psychotic symptoms or side effects from medications. (ECF No. 12 at 864). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 864). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 864). His thoughts were goal directed. (ECF No. 12 at 864). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 864).

After a January 5, 2017 visit, Sprout noted that Rininger was having trouble getting medicine; he had been without it for about a week and a half. (ECF No. 12 at 868). He remarked that being without medicine had made him realize that it is helpful to him to continue the treatments. (ECF No. 12 at 868). He had had more mood swings, more paranoia, had heard whispering voices, and had more anxiety without medication. (ECF No. 12 at 868). Still, he denied any suicidal or homicidal ideations, intents, or plans. (ECF No. 12 at 868). His Sleep had gotten worse, and his appetite and energy were down. (ECF No. 12 at 868). He noted no side effects from medications. (ECF No. 12 at 868). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 868). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 868). His thoughts were goal directed. (ECF No. 12 at 868). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 868).

After a March 16, 2017 visit, Sprout noted that Rininger was experiencing greater twitching tremors. (ECF No. 12 at 875). His sleep was fair, and his appetite was good. (ECF No. 12 at 875). He experienced intermittent visual hallucinations and paranoia. (ECF No. 12 at 875). He had no suicidal or homicidal ideations, intents, or plans. (ECF No. 12 at 875). He was casually dressed in

age-appropriate clothing and well-groomed. (ECF No. 12 at 875). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 875). His thoughts were goal directed. (ECF No. 12 at 875). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 875).

After a May 5, 2017 visit, Sprout noted that Rininger was feeling irritable and paranoid. (ECF No. 12 at 881). His sleep was fair, his appetite was good, his energy was low, and his concentration was poor. (ECF No. 12 at 881). He had no suicidal or homicidal ideations, intents, or plans. (ECF No. 12 at 881). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 881). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 881). His thoughts were goal directed. (ECF No. 12 at 881). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 881).

After a June 15, 2017 visit, Sprout noted that Rininger's depression was better with an increased does of Abilify, but he was still having problems with irritability. (ECF No. 12 at 883). His sleep was slightly better, and his appetite was good. (ECF No. 12 at 883). He had no auditory or visual hallucinations or paranoia, and no side effects from medications. (ECF No. 12 at 883). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 883). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 883). His thoughts were goal directed. (ECF No. 12 at 883). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 883).

After a July 20, 2017 visit, Sprout noted that Rininger had increased irritability and depression, his sleep was fair, his appetite was good, his energy was low, and his concentration was poor. (ECF No. 12 at 887). He had no auditory or visual hallucinations but some paranoia. (ECF No. 12 at 887). He was casually dressed in age-appropriate clothing and was well-groomed. (ECF No. 12 at 887). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 887). His

thoughts were goal directed. (ECF No. 12 at 887). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 887).

After an October 5, 2017 visit, Sprout noted that Rininger's irritability was unchanged. (ECF No. 12 at 893). He continued to have anxiety. (ECF No. 12 at 893). His sleep was now poor, but his appetite was good. (ECF No. 12 at 893). He had no auditory or visual hallucinations or medicine side effects, but some intermittent paranoia. (ECF No. 12 at 893). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 893). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 893). His thoughts were goal directed. (ECF No. 12 at 893). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 893).

After a December 7, 2017 visit, Sprout noted that Rininger was "doing ok," but that he still had some irritability and lots of stressors. (ECF No. 12 at 895). His sleep was fair, his appetite was good, his energy was low, and his concentration was poor. (ECF No. 12 at 895). He had no auditory or visual hallucinations or side effects from medications, but some intermittent paranoia. (ECF No. 12 at 895). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 895). He spoke with a normal rate, volume, and tone. (ECF No. 12 at 895). His thoughts were goal directed. (ECF No. 12 at 895). He had good insight and judgment and was oriented to person, place, and time. (ECF No. 12 at 895). He was pleasant and cooperative. (ECF No. 12 at 895).

After a March 16, 2018 visit, Sprout noted that Rininger was not having as many mood swings and his irritability was less. (ECF No. 12 at 897). He was a little more depressed, his sleep was again good, and his appetite ok. (ECF No. 12 at 897). He had no auditory or visual hallucinations and was less paranoid. (ECF No. 12 at 897). He was casually dressed in age-appropriate clothing and well-groomed. (ECF No. 12 at 897). He spoke with a normal rate, volume,

9

and tone. (ECF No. 12 at 897). His thoughts were goal directed. (ECF No. 12 at 897). He had good insight and judgment and was oriented to person, place, time, and situation. (ECF No. 12 at 897). He was again pleasant and cooperative. (ECF No. 12 at 897).

### B.    Relevant Testimonial Evidence

#### 1.    Rininger

Rininger testified at the June 14, 2018 hearing. Rininger is married and has four children, one of whom lives with him full time. (ECF No. 12 at 114-15). His wife receives disability-insurance benefits due to her bipolar-disorder diagnosis. (ECF No. 12 at 115). He has an eighth-grade education. (ECF No. 12 at 117). He can read and write, but he has trouble spelling words. (ECF No. 12 at 118). He can add and subtract numbers, but he struggles with multiplication. (ECF No. 12 at 118-19). Although his wife handles the couple's finances, Rininger is sure that he could do so if he tried. (ECF No. 12 at 119).

Rininger had a disability-insurance-benefits claim that ended unfavorably in 2016. (ECF No. 12 at 160). Since then, Rininger believes that his increased anxiety and depression have increased—there are days during which he does not "even want to get out of bed." (ECF No. 12 at 120). A leg injury from Rininger's prior claim still causes him pain and discomfort and limits his rapid movement. (ECF No. 12 at 120-21). Rininger stated that he can walk for about 30 minutes without issue. (ECF No. 12 at 122). He takes only Tylenol or ibuprofen to manage his pain because he doesn't want to get addicted to stronger pain medications. (ECF No. 12 at 122-23).

Rininger stated that his mental-health medications have caused some side effects like "[a] lot of drowsiness, tiredness, [and] irritability." (ECF No. 12 at 124). He sleeps from four to six hours per day but does not nap. (ECF No. 12 at 124). He feels "real[ly] lethargic and just want[s] to lay around and not do much" during the day. (ECF No. 12 at 124). He acknowledged that he

can take care of his personal hygiene, but he doesn't "feel like doing it." (ECF No. 12 at 127). He has attended mental-health counseling but doesn't do so much anymore because he feels as though he tells "the same thing[,] over and over again" to the therapist during treatment; it didn't feel useful anymore. (ECF No. 12 at 127-28). Rininger acknowledged, though, that he had continued seeing Sprout and that she had noted positive trends in his therapy and medications. (ECF No. 12 at 129-30).

About a year before the hearing, Rininger had lived with his wife's parents, which aggravated his anxiety because there were too many people around. (ECF No. 12 at 129). He originally stated that he has more bad days than good days with his anxiety and depression, "probably … five bad days and two/three good days" per week. (ECF No. 12 at 130). Rininger later explained that he feels that his depression is severe about "10 to 15 days out of a month, half the month." (ECF No. 12 at 150). On bad days, Rininger is very irritable and cannot stand to be around people; he tries to exclude himself from them by sitting in a room by himself away from others. (ECF No. 12 at 130). He helps his wife to care for their child when he can by playing with the child at times to keep him occupied. (ECF No. 12 at 131). He sometimes fixes the child's breakfast or bathes him at night. (ECF No. 12 at 131). Sometimes, both Rininger and his wife have bad mental-health days; they "try to pull it together as much as [they] can to make it work … and get through it." (ECF No. 12 at 134).

Rininger initially said that he hallucinates several times per day (ECF No. 12 at 142), but later clarified that he hallucinates less (or not at all) some days, while more other days. (ECF No. 12 at 144). He described his hallucinations as "seeing things, hearing things, thinking people are looking in my windows… I might be sitting there … looking at something[,] and I look back and then I see … [that] somebody is standing there … staring at me, but then when I look back again

11

they're gone[,] and it was nothing." (ECF No. 12 at 142). He testified that he continues to hallucinate despite being on a Risperidone (an anti-psychotic) regimen; Sprout has told Rininger that she is adjusting his medications. (ECF No. 12 at 142). Rininger said that he does not recognize the voices, and he cannot always make out what is being said. (ECF No. 12 at 143-44). Rininger noted that his anti-psychotic medications reduce the auditory hallucinations. (ECF No. 12 at 144).

Rininger doubts that he could work a job at which he would have to regularly deal with people, for example in a security-guard or janitorial role. (ECF No. 12 at 134). That is because Rininger believes that he is unreliable—he "can't show up every day… Like[, he] might be able to do it one day, but [he] probably couldn't come back the next day." (ECF No. 12 at 135). He doubts that he would be able to wake up on time, or that he would fail because the pressure and stress of a new job would be too much for him. (ECF No. 12 at 135). He showers about every other day and can shave himself and brush his teeth. (ECF No. 12 at 136). Occasionally, in major depressive states, Rininger has gone three or four days without showering. (ECF No. 12 at 149). He can dress himself. (ECF No. 12 at 141). He does not do household chores—he does not want to do them. (ECF No. 12 at 135-36).

When asked by counsel about this lack of desire to do life tasks, Rininger clarified that when he says *I don't want to*, he feels as though it is something that he cannot control. (ECF No. 12 at 145). And in the context of maintaining a job, Rininger clarified that he does "want to do things, but [he] just can't… [He] can't find the energy …, the gumption to do [them]." (ECF No. 12 at 146). He extrapolated with examples: "[I] try to cook dinner or maybe try to wash the dishes or maybe start some laundry [that I had been] … meaning to wash…, but only … put [the clothes] in the washing machine and [they] never make it to the dryer." (ECF No. 12 at 147). He doesn't follow through with things because he "just feel[s] real[ly] lazy and tired and do[es]n't want to do

[any]thing … and [feels] really bad[ly] depressed[, …] just sitting around in a depression all [of] the time." (ECF No. 12 at 146-47).

 Rininger described a normal day like so:

> I wake up in the morning. I get some coffee. I have a cigarette. I try to interact with my family. Then I start to get aggravated and irritated with them, so I tell them to leave me alone or get away from me[,] … then I feel bad[ly] later on[;] … I make up to them and tell them that I'm sorry for acting that way. Then [within] … a couple of hours … I'm right back to it[,] … excluding myself away from them and going to the bedroom and I can't be around them[;] … then I make up to them[.] … I feel like you can only tell somebody [that] you're sorry so many times, you know, and it's like I'm living this bad dream that just repeats itself over and over again.

(ECF No. 12 at 147).

 Rininger owns a vehicle and possesses a valid driver's license; he drives the vehicle as little as possible, about once or twice a week. (ECF No. 12 at 116-17). Rininger shops for groceries with his wife and children about every week at a store twenty minutes from his residence. (ECF No. 12 at 137). Those trips are generally the longest car trips he takes. (ECF No. 12 at 141). He does not have issues taking his medication regularly or on schedule. (ECF No. 12 at 138). He struggles to watch television and follow plot lines. (ECF No. 12 at 138-39). He does not generally talk with his neighbors, but he does not have issues with them, either. (ECF No. 12 at 139). He has not been arrested in at least the last decade. (ECF No. 12 at 139-40). He does not have any regular friends. (ECF No. 12 at 140). He sees his mother, who lives close to him, once or twice a month. (ECF No. 12 at 140). Rininger and his wife occasionally take their kids to a park, which is about ten minutes away, to play. (ECF No. 12 at 140). He said that he does not usually take the children to school in the morning because he doesn't "like to go to the school and deal with all the people." (ECF No. 12 at 145). Similarly, Rininger said also that his grocery trips can trigger his anxiety,

especially in larger stores like Walmart, from being around other people. (ECF No. 12 at 151). Anticipating his appearance at the hearing caused anxiety. (ECF No. 12 at 151).

Rininger sees Goldner for pain management treatments and visits "about every three months." (ECF No. 12 at 124-25). He has received medial branch blocks, but they have not always been successful. (ECF No. 12 at 125). He can sit for about 30 minutes before needing to stand up. (ECF No. 12 at 126). He has done physical therapy—about two or three weeks of it in December 2017. (ECF No. 12 at 126).

Rininger explained that his neck and back pain and limitations mean that he "can't bend like [he] used to be able to. [He] can't move [his] head around like [he] used to be able to… It hurts and it causes lots of pain." (ECF No. 12 at 148). When asked to quantify his pain level on a one-to-ten scale, he scored it as a five—even with his Tylenol and ibuprofen regimen. (ECF No. 12 at 148). Going to the grocery store aggravates his neck and back pain, as does "just trying to be a father … going out there and trying to play with the kids[,] … get[ting] involved and do[ing] things with them[.] … [J]ust, you know, carrying things[,] or if I'm carrying something, grocery bags or something like that, it just makes my pain worse." (ECF No. 12 at 148-49).

2.  Vocational Expert Joanne Pfeffer

Joanne M. Pfeffer, a vocational expert, testified at the hearing. She reviewed Rininger's file before the hearing and listened to his testimony. (ECF No. 12 at 152-53). The ALJ posed to Pfeffer this residual functional capacity ("RFC"):

> … at the light level… [C]an occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds … occasionally operate foot controls with the right lower extremity; frequently balance, stoop, kneel, crouch[,] and crawl; avoid hazards[,] such as dangerous moving machinery or unprotected heights; understand, remember[,] and carry out simple instructions; perform simple, routine[ ,] and repetitive tasks, but not at a production-rate pace[,] such as an

14

assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; interact occasionally with supervisors and co-workers[, but] … no interaction with the general public.

(ECF No. 12 at 154). Pfeffer considered the RFC and concluded that there are occupations in significant numbers in the national economy that such an individual could perform. (ECF No. 12 at 154). She clarified that the Dictionary of Occupational Titles ("DOT") "does not address the frequency of contact with co-workers [or] supervisors." (ECF No. 12 at 154). Pfeffer stated that the following three representative light-exertion occupations existed: (1) collator-operator, DOT 208.685-010, SVP 2, 54,000 jobs in the national economy; (2) inspector, DOT 529.687-186, SVP 2, 300,000 jobs in the national economy; and (3) hand packager, DOT 559.687-074, SVP 2, 500,000 jobs in the national economy. (ECF No. 12 at 155).

The ALJ had Pfeffer then consider the RFC at the sedentary level. At that level, Pfeffer noted three more representative occupations: (1) addresser, DOT 209.587-018, 67,000 jobs in the national economy; (2) hand polisher, DOT 713.684-038, SVP 2, 74,000 jobs in the national economy; and (3) document preparer, DOT 249.587-018, SVP 2, 100,000 jobs in the national economy. (ECF No. 12 at 155).

The ALJ then asked Pfeffer to reconsider her assessment with a new hypothetical: The "individual would consistently be absent two or more days per month." (ECF No. 12 at 155). Pfeffer responded "no…" (ECF No. 12 at 155). Pfeffer's answer was based only on her experience. (ECF No. 12 at 155). Pfeffer explained that there are three customary work breaks during an eight-hour workday and tolerable absenteeism would be, at most, two days per month, but that an employer would not expect or want that absenteeism rate to persist. (ECF No. 12 at 156).

Rininger's counsel then asked Pfeffer whether her analysis to either of the ALJ's hypotheticals would change if "the [hypothetical] individual would be able to perform pushing and

15

pulling and gross manipulation only occasionally." (ECF No. 12 at 156). She stated that it would because most of her representative jobs have "frequent reaching, handling[,] and fingering…" (ECF No. 12 at 156). The representative jobs included gross manipulation and handling; they would be excluded under the changed hypothetical. (ECF No. 12 at 157). And that additional limitation would, ultimately, exclude the hypothetical individual from all work. (ECF No. 12 at 158). So too would a limitation that the hypothetical individual work in isolation. (ECF No. 12 at 158).

### C.    Relevant Opinion Evidence

#### 1.    Goldner's Physical Functional Assessment

Goldner provided a functional assessment, which he authored on February 26, 2018, for Rininger's hearing. (ECF No. 12 at 744-45). The assessment asked Goldner to consider 13 questions and score Rininger's ability to perform within them. (ECF No. 12 at 744-45). The first question asked whether lifting or carrying are affected by Rininger's impairment. (ECF No. 12 at 744). Goldner checked the box reading "no," and stated that Rininger could lift or carry 13 pounds occasionally and 8 pounds or less on a frequent basis. (ECF No. 12 at 744). The second question asked whether standing or walking are affected by an impairment. (ECF No. 12 at 744). Goldner responded "yes," noting that Rininger could walk for about 55 minutes in total over an eight-hour period. (ECF No. 12 at 744). The third question asked whether sitting was affected by an impairment. (ECF No. 12 at 744). Goldner responded "yes," noting that Rininger could sit for 23 minutes in total over an 8-hour day. (ECF No. 12 at 744). The fourth question asked how often could Rininger perform several activities: climbing, balancing, stooping, crouching, kneeling, and crawling. (ECF No. 12 at 744). Goldner answered that Rininger could rarely do them, which, per the assessment's instructions, means that "the activity cannot be performed for any appreciable

16

period of time." (ECF No. 12 at 744). The fifth question asked how often could Rininger reach, push or pull, finely manipulate, or grossly manipulate. (ECF No. 12 at 745). Goldner responded that Rininger could frequently reach—it caused no difficulty—but only rarely push or pull, finely manipulate, or grossly manipulate. (ECF No. 12 at 745). The sixth question asked whether there were environmental restrictions that affect Rininger's impairments. (ECF No. 12 at 745). Goldner responded that there were not. (ECF No. 12 at 745). These six questions asked that Goldner provide the "medical findings that support th[e] assessment." (ECF No. 12 at 744). Goldner cited DePolo's 2018 physical-functional-capacity evaluation as his support each time. (ECF No. 12 at 744-45).

The seventh question asked whether Rininger had been prescribed a cane, walker, brace, TENS unit, breathing machine, oxygen, or wheelchair. (ECF No. 12 at 745). Goldner checked "yes" for a TENS unit but "no" for the others. (ECF No. 12 at 745). The eighth question asked whether Rininger would need to be able to alternate positions between sitting, standing, and walking at will. (ECF No. 12 at 745). Goldner checked "yes." (ECF No. 12 at 745). The ninth question asked whether Rininger experienced pain and, if so, to what degree. (ECF No. 12 at 745). Goldner circled "yes" and rated Rininger's pain as both moderate and severe. (ECF No. 12 at 745). The tenth question asked whether the pain: (1) interferes with Rininger's concentration; (2) takes him off task; and (3) causes absenteeism. (ECF No. 12 at 745). Goldner checked "yes" for subparts one and two, but "no" for subpart three. (ECF No. 12 at 745). The eleventh question asked whether Rininger needed to elevate his legs at will. (ECF No. 12 at 745). Goldner responded "no." (ECF No. 12 at 745). The twelfth question asked whether Rininger required additional unscheduled rest periods during an eight-hour workday outside of a standard 30-minute lunch break and two fifteen-minute breaks. (ECF No. 12 at 745). Goldner checked "yes," and explained that Rininger could perform only limited physical activity before requiring more rest. (ECF No. 12 at 745). The

17

thirteenth question asked whether Rininger had any additional limitations that would interfere with his ability to work eight hours per day, five days per week. (ECF No. 12 at 745). Goldner noted that Rininger "cannot lift, stand, walk, or do any physical activity for long periods of time." (ECF No. 12 at 745).

### 2. Sprout's Mental Functional Assessment

Sprout provided a mental functional assessment. (ECF No. 12 at 705-06). Sprout's mental functional assessment focused on four main areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, and maintain pace; and (4) adapt or manage oneself. (ECF No 12 at 705-06). Each of the four criteria had eight sub-questions that further assess the subject's level of impairment. (ECF No. 12 at 705-06). Sprout then scored each sub-question on the following scale:

- No limitation (or none): Patient is able to function in this area independently, appropriately, effectively, and on a sustained basis.

- Mild limitation: Patient's functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

- Moderate limitation: Patient's functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

- Marked limitation: Patient's functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

- Extreme limitation: Patient is not able to function in this area independently, appropriately, effectively, and on a sustained basis.

(ECF No. 12 at 705). Sprout noted that she had seen Rininger since April 2, 2015, and that he had been diagnosed with bipolar disorder and anxiety disorder (unspecified), with paranoia, hallucinations, and racing thoughts for symptoms. (ECF No. 12 at 706).

18

Under the first criterion, Sprout scored Rininger as extremely limited in six of the sub-questions: (1) describe work activity to someone else; (2) ask and answer questions and provide explanations; (3) recognize a mistake and correct it; (4) identify and solve problems; (5) sequence multi-step activities; and (6) use reason and judgment to make work-related decisions. (ECF No. 12 at 705). Sprout scored Rininger as markedly limited in the two remaining sub-questions: (1) understand and learn terms, instructions, or procedures; (2) follow 1 or 2 step oral instructions to carry out a task. (ECF No. 12 at 705).

Under the second criterion, Sprout scored Rininger as extremely limited in five of the sub-questions: (1) cooperate with others; (2) ask for help when needed; (3) handle conflicts with others; (4) respond to requests, suggestions, criticisms, correction, and challenges; and (5) keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspicion. (ECF No. 12 at 705). Sprout scored Rininger as markedly limited in his ability to understand and respond to physical, verbal, and emotional social cues. (ECF No. 12 at 705). Sprout scored Rininger as moderately limited in the remaining two sub-questions: (1) state his own point of view; and (2) initiate or sustain conversation. (ECF No. 12 at 705).

Under the third criterion, Sprout scored Rininger as extremely limited in seven of the eight sub-questions: (1) work at an appropriate and consistent pace; (2) complete tasks in a timely manner; (3) ignore or avoid distractions while working; (4) change activities or work settings without being disrupted; (5) work close to or with others without interrupting or distracting them; (6) sustain an ordinary routine and regular attendance at work; and (7) work a full day without needing more than the allotted number or length of rest periods during the day. (ECF No. 12 at 706). Sprout scored Rininger as markedly limited in the remaining sub-question, initiating and performing a task that he understands and knows how to do. (ECF No. 12 at 706).

Under the fourth criteria, Sprout scored Rininger as extremely limited in only four of the sub-questions: (1) respond to demands; (2) adapt to changes; (3) manage one's physiologically based symptoms; and (4) make plans for himself independently of others. (ECF No. 12 at 706). Sprout scored Rininger as markedly limited in three other sub-questions: (1) distinguish between acceptable and unacceptable work performance; (2) set realistic goals; and (3) be aware of normal hazards and take appropriate precautions. (ECF No. 12 at 706). Sprout scored Rininger as mildly limited in his ability to maintain personal hygiene and attire appropriate to a work setting. (ECF No. 12 at 706).

Collectively, Sprout opined that Rininger was extremely limited in 22 of the 32 sub-questions and markedly limited in seven others. (ECF No. 12 at 705-06). Sprout asserted that Rininger was moderately limited in two sub-questions and mildly limited in only one sub-question. (ECF No. 12 at 705-06). Sprout did not tally or summarize her opinion.

### 3.    State Agency Physical Consultants

Mehr Siddiqui, M.D., a State Agency medical consultant, reviewed Rininger's physical medical evidence at the initial-consideration stage and contributed a RFC. He reviewed records up to March 2017. (ECF No. 12 at 192). Siddiqui noted that Rininger's impairments could reasonably be expected to produce Rininger's pain or other symptoms—weakness, sustained-concentration and persistence limitations, and social-interaction limitations. (ECF No. 12 at 197). He concluded, though, that Rininger's statements about the intensity, persistence, and functionally limiting effects of the symptoms could not be supported by the objective medical evidence alone—they were only partially consistent. (ECF No. 12 at 197). Siddiqui noted that Rininger lacked longitudinal treatment records for his physical pain, did not exhibit treatment-seeking behavior, and did not

20

generally treat his physical impairments other than with medication. (ECF No. 12 at 197). He also

noted that:

> [Rininger] reports his legs cannot handle lifting, squatting, standing,
> walking, kneeling and stair climbing. He states that he can walk 10-
> 15 min[utes] before needing to rest. The medical records show that
> he has [normal] gait and strength. He does not use ambulatory aids.
> He seeks minimal treatment for his phys[ica]l conditions.

(ECF No. 12 at 197).

With the evidence and those conclusions in mind, Siddiqui determined that Rininger's RFC

should reflect the following physical characteristics:

> to perform medium work … except: frequently climb ramps and
> stairs; occasionally climb ladders, ropes, and scaffolds; occasionally
> operate foot controls with [his] right lower extremity; frequently
> balance, stoop, kneel, crouch, and crawl; and avoid hazards such as
> dangerous moving machinery or unprotected heights.

William Bolz, M.D., a State Agency medical consultant, then reviewed Rininger's records

at the reconsideration stage. He reviewed evidence up to May 12, 2017. (ECF No. 12 at 219). He

too noted that Rininger's impairments could reasonably be expected to produce Rininger's pain or

other symptoms—pain, weakness, sustained-concentration and persistence limitations, and social-

interaction limitations. (ECF No. 12 at 224). He concluded, though, that Rininger's statements

about the intensity, persistence, and functionally limiting effects of the symptoms could not be

supported by the objective medical evidence alone—Bolz, too, saw them as only partially

consistent. (ECF No. 12 at 224). He noted, as had Siddiqui, that Rininger lacked longitudinal

treatment records for his physical pain, did not exhibit treatment-seeking behavior, and did not

generally treat his physical impairments other than with medication. (ECF No. 12 at 224). Bolz

adopted Siddiqui's proposed RFC as Siddiqui had drafted it. (ECF No. 12 at 225).

4.      State Agency Psychological Consultants

21

Marjorie Kukor, Ph.D., a State Agency psychological consultant, reviewed Rininger's mental medical evidence at the initial-consideration stage. (ECF No. 12 at 196). She reviewed records up to March 2017. (ECF No. 12 at 192). She determined that Rininger's depressive, bipolar, and related disorders were severe impairments. (ECF No. 12 at 195). She noted that a medically determinable impairment was present to satisfy the *paragraph A* criteria. (ECF No. 12 at 196). She concluded, however, that Rininger did not meet the *paragraph B* criteria. Kukor concluded that Rininger was mildly impaired in his ability to understand, remember or apply information. (ECF No. 12 at 196). He was moderately impaired in his abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (ECF No. 12 at 196). Kukor concluded that Rininger did not meet the *paragraph C* criteria. (ECF No. 12 at 196).

Kukor contributed a mental RFC assessment that read:

> [Rininger] can understand, remember and carry out simple instructions; perform simple, routine, and repetitive tasks, but not at a production rate pace[,] such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; and interact frequently with supervisors and coworkers, but can have no interaction with the general public.

(ECF No. 12 at 212).

Paul Tangeman, Ph.D., a State Agency psychological consultant, reviewed Rininger's mental medical evidence at the reconsideration stage. He reviewed evidence up to April 25, 2017. (ECF No. 12 at 219). He concluded that Rininger's trauma- and stressor-related disorders; depressive, bipolar, and related disorders; and borderline intellectual functioning were severe impairments. (ECF No. 12 at 222). He too noted that a medically determinable impairment was present to satisfy the *paragraph A* criteria. (ECF No. 12 at 222). And he too concluded, though, that Rininger did not meet the *paragraph B* criteria, noting that Rininger was mildly impaired in his ability to understand, remember or apply information. (ECF No. 12 at 223). He was moderately

impaired in his abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (ECF No. 12 at 223). Tangeman concluded that Rininger did not meet the *paragraph C* criteria, either. (ECF No. 12 at 223).

Tangeman contributed a mental RFC assessment that read:

> [Rininger] can understand, remember and carry out simple instructions; perform simple, routine, and repetitive tasks, but not at a production rate pace[,] such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; and interact frequently with supervisors and coworkers, but can have no interaction with the general public.

(ECF No. 12 at 225-26).

## IV.    The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact:

> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally operate foot controls with right lower extremity; frequently balance, stoop, kneel, crouch, and crawl; and should avoid hazards such as dangerous moving machinery or unprotected heights. In addition, the claimant can understand, remember, and carry out simple instructions; perform simple, routine, and repetitive tasks, but not at a production rate pace, such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; and interact occasionally with supervisors and coworkers, but can have no interaction the general public;
>
> …

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 14, 2016, through the date of this decision (20 CFR 416.920(g)).

(ECF No. 12 at 23-24, 30).

## V.      Law and Analysis

### A.      Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." Id. And the court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District Courts follow Sarchet's logical-bridge requirement[3] because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v);

---

[3] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Medical-Source Opinion Evidence

Rininger's first assignment of error concerns the weight and credit apportioned to Goldner's and Sprout's medical opinions. The argument has two subparts. First, Rininger argues that both Goldner and Sprout are treating-source physicians whose opinions should have been given controlling weight under 20 C.F.R. § 404.1527(d)(2) and 20 C.F.R. § 416.927(d)(2). (ECF No. 16 at 12). To that end, Rininger believes that the ALJ cherry picked the evidence to support his preferred conclusion that Rininger is not disabled, rather than properly analyzing the entire record. (ECF No. 16 at 13). Second, Rininger objects to the ALJ's decision to give partial weight to the State Agency's medical and psychological consultants' opinions. (ECF No. 16 at 16). As Rininger sees it, an ALJ cannot give greater weight to a consultant's opinion than he did to a treating source's opinion. (ECF No. 16 at 17).

The Commissioner disagrees. As for Goldner, the Commissioner contends that he is not a treating source under the regulations because the Rininger–Goldner treating relationship did not sufficiently exist before Goldner authored his physical functional assessment. (ECF No. 19 at 16). But even if such a relationship satisfied the test, the Commissioner argues that the ALJ stated *good reasons* for not giving Goldner's opinion controlling weight. (ECF No. 19 at 16-17). Although conceding that Sprout is a treating source, the Commissioner notes that the ALJ gave little weight to Sprout's opinion because it was inconsistent with the rest of the objective record—including her own treatment notes. (ECF No. 19 at 14). The Commissioner argues that that is a *good reason*; thus, Sprout's opinion was not entitled to controlling weight, either. (ECF No. 19 at 14).

26

When Rininger filed his claim, the applicable regulation stated that an ALJ must give a treating source's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2) (*repealed*, 82 Fed. Reg. 15,132 (Mar. 27, 2017)).[4] Controlling weight means that the ALJ "must adopt a treating source's medical opinion irrespective of any finding [that the AOLF] would have made in the absence of the medical opinion." Soc. Sec. Rul. 96-2p, 1996 LEXIS 9 (S.S.A. July 2, 1996) (*rescinded*, Recision of Social Security Rulings 96-2p, 96-5p, and 06-03p, 2017 WL 3928298 (S.S.A. Mar. 27, 2017).[5] But a treating source's opinion receives controlling weight only if two elements are satisfied: (1) the "treating source's medical opinion on the issue(s) of the nature and severity of [the] impairment(s)" must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion cannot be "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

The Commissioner will "always give good reasons in [its] notice of determination or decision for the weight [it] give[s to a claimant's] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). Good reasons are those that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. If the ALJ fails to state his good reasons and how they affected the weight apportioned to the treating-source's opinion, then it "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Such a failure requires remand. *Id.*

---

[4] 20 C.F.R. § 404.1527 was prospectively repealed on March 27, 2017. Because this case was filed on December 21, 2016, the regulation controls Rininger's case.

[5] SSR 96-2p was prospectively rescinded on March 27, 2017; it too controls Rininger's case.

1. The Rininger–Goldner Treating Relationship

The weight due to Goldner's opinion turns on the length and nature of the Rininger–Goldner treating relationship before Goldner authored his January 2018 functional assessment. In a footnote that does not cite to the record, Rininger asserts first that Goldner treated Rininger's physical maladies in 2016. (ECF No. 16 at 6, n. 1). Rininger then argues that Goldner was a treating source when he authored his assessment in January 2018. (ECF No. 16 at 11). But Rininger never explains the nature of the Rininger–Goldner treating relationship. The Commissioner, after reviewing the record, contends that Goldner saw Rininger only twice before authoring the functional assessment. (ECF No. 19 at 16).

The regulations define *treating source* as "your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2). The Commissioner will "[g]enerally … consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." 20 C.F.R. § 404.1527(a)(2). Although a claimant and his treating source usually have an established, long-term treatment relationship, the Commissioner "may consider" someone who has "treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)." 20 C.F.R. § 404.1527(a)(2).

Sixth Circuit caselaw has further refined the scope of the treating relationship. In *Barker v. Shalala*, for example, the court stated that

> [t]he treating physician doctrine is based on the assumption that a
> medical professional who has dealt with a claimant and his maladies

28

> over a long period of time will have a deeper insight into the medical
> condition of the claimant than will a person who has examined a
> claimant but once, or who has only seen the claimant's medical
> records.

40 F. 3d 789, 794 (6th Cir. 1994). And in *Harrison v. Astrue*, this Court found that a physician

who had seen the claimant-patient only two times before offering his medical opinion was not a

treating source. *Harrison v. Astrue*, No. 1:11-cv-00117, 2012 WL 130880, at *13 (N.D. Ohio Jan.

3, 2012) (*aff'd*, *Harrison v. Astrue*, No. 1:11-cv-00117, 2012 WL 135659 (N.D. Ohio Jan. 17,

2012)). And concerning an early assessment by one who *later* became a treating source, the Sixth

Circuit noted that the question is not whether the purported treating source might have become a

treating physician at some future point; it is whether she had an ongoing relationship with the

claimant to qualify as a treating physician at the time the purported treating source authored the

opinion. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006).

Based on the record before the Court, Goldner is not a treating source. The record shows

that Rininger visited Goldner on December 5, 2017 (ECF No. 12 at 749), February 7, 2018 (ECF

No. 12 at 786), March 7, 2018 (ECF No. 12 at 790), and April 9, 2018. (ECF No. 12 at 937).

Goldner authored his physical functional assessment on February 26, 2018 (ECF No. 12 at 744-

45). When Goldner authored his physical functional assessment, he had treated Rininger only two

times. (ECF No. 12 at 744-45). That short-term relationship, which was consultative in nature,

does not satisfy the premise "that a medical professional who has dealt with a claimant and his

maladies over a long period of time will have a deeper insight into the medical condition…"

*Barker*, 40 F. 3d at 794.

Rininger points to just one page in the record that could support the assertion that the

relationship was more substantial: page 746. (ECF No. 16 at 16). That page is from a physical

therapy form dated December 8, 2017, and it states that Rininger's "PT onset date" was December

8, 2016. (ECF No. 12 at 746). But the record appears to contradict that assertion: On November 3, 2017, Mashburn referred Rininger to physical therapy (DePolo) and pain management services (Goldner). (ECF No. 12 at 697). There are no records of a Rininger–Goldner visit in 2016, nor for any visits during the first 11 months 2017.[6] The ALJ—and this Court—cannot conclude that there was a long-term treatment relationship during 2017 unless the record reflects it.

Nor is this an instance in which long intervals between visits (due to the nature of the treatment or evaluation needed) would satisfy the treating-physician rule. 20 C.F.R. § 404.1527(a)(2). During the hearing, Rininger noted that he sees Goldner "[a]bout every three months." (ECF No. 12 at 125). For its part, the record shows that Rininger visited Goldner on a monthly basis from December 2017 through April 2018. A year-long lapse is not typical of this relationship. Thus, Goldner's opinion could not be entitled to controlling weight.

Instead, Goldner's opinion was simply a medical-source opinion. An ALJ must consider and appropriately weigh a non-controlling medical-source opinion under the regulations' six factors: (1) the examining relationship; (2) the treatment relationship; (3) the supportability of the evidence; (4) the opinion's consistency to the record as a whole; (5) the author's specialization to the relevant medical issue; and (6) the "other factors … that tend to support or contradict the medical opinion." 20 C.F.R. § 404.1527(c).

The ALJ did not state how he analyzed those factors in reaching his decision; instead, he discussed only the inconsistencies between Goldner's assessment and other evidence in the record, finding ultimately that Goldner's "opinion and [Rininger's] performance at the functional capacity

---

[6] Rininger requested his medical records from Fisher Titus Medical Center (where Goldner practices) from January 2017 through April 2018. (ECF No. 16 at 803). If such visits occurred, then Rininger could have ensured that Goldner's treatment notes for those visits were present in the record.

evaluation are generally inconsistent with the record as a whole," which could justify not giving a treating-source's opinion controlling weight (if it were necessary here). (ECF No. 12 at 28). The ALJ's limited narrative, though, is not necessarily error. If the ALJ considered the full record in making his decision, then the ALJ is not obligated to memorialize every discrete component of the decisional process. *Kornecky*, 167 F. App'x at 507-08 ("[I]t is well settled that ...an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts."). Moreover, the Court has rejected the argument that an ALJ who notes *good reasons* for rejecting a treating-source's opinion must analyze separately—*i.e.*, must not conflate—the good-reasons standard and the non-controlling-weight factors. *Ware v. Berryhill*, No. 1:16-cv-2375, 2018 WL 1202588, *5-6 (N.D. Ohio Mar. 8, 2018) (analyzing *Gayhart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013)).

That is the case here, as the ALJ sufficiently considered and memorialized the record in reaching his decision. Substantial evidence supports giving Goldner's opinion lesser weight based on the factors. Goldner was not in a long-term treating relationship with Rininger when he authored the assessment, and he cited Rininger's functional-capacity examination with DePolo as the main support for his conclusions. Thus, Goldner lacked the kind of "longitudinal picture of [Rininger's] impairment[s]" as discussed at 20 C.F.R. § 404.1527(c)(i). And the ALJ noted inconsistencies between Goldner's assessment and the objective medical evidence—in particular, Rininger's spinal imaging studies, which "showed minimal lumbar degenerative disc disease, with no stenosis, and ... no significant spinal canal stenosis" despite "cervical degenerative disc disease at C5-C6... [And e]xaminations showed normal gait, strength, and sensation..." (ECF No. 12 at 27-

28 (citing exhibit B12F)). Although the other factors may favor an alternative conclusion, it is not

the Court's role on substantial-evidence review to reweigh the evidence; the Commissioner enjoys

a "zone of choice" within which to decide cases without the court second guessing him. *Mullen*,

800 F.2d 545.

Of course, the ALJ cannot selectively parse various medical reports to suit a pre-

determined outcome. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014). In

*Gentry*, the ALJ's error was "failing to address certain portions of the record"—the ALJ omitted

all "evidence of a continuing illness that was not resolved despite use of increasingly serious and

dangerous medications," and ignored "the record evidence supporting a finding that [the claimant]

had extensive skin lesions for at least 3 months despite continuing treatment." *Id.* at 724-25. That

oversight caused the ALJ to not properly determine whether the claimant met certain disability

listings. *Id.*

Here, Rininger argues that

> [he] continuously exhibited severe pain, tenderness, and a limited
> range of motion in his lumbar and cervical spine. He had difficulty
> tolerating physical therapy exercises due to pain. Injections failed to
> provide any relief for his pain. During his last appointment
> contained in the record, Mr. Rininger endorsed unchanged
> symptoms of back, neck, shoulder, and thigh pain that usually rated
> as an eight out of ten on the pain scale. Therefore, the fact that during
> some of Mr. Rininger's examinations with Dr. Goldner he exhibited
> negative straight leg tests and an unaltered gait is not material. The
> medical record contains a host of evidence that supports the findings
> of the physical functional test, which found Mr. Rininger's capacity
> severely limited due to pain. A few straight leg tests and gait
> observations are selected pieces of evidence used to deny the
> findings of a series of tests that were found to be reliable.

(ECF No. 16 at 13-14) (internal citations omitted). Despite Rininger's assertions, cherry picking

is not a concern here. The ALJ chronicled Rininger's physical limitations and symptoms in his

opinion. (ECF No. 12 at 26). Although his narrative is not exhaustive, it is comprehensive, which

demonstrates to the Court that the ALJ fully considered Rininger's medical records and conflicting evidence in considering what weight to give Goldner's opinion. *Kornecky*, 167 F. App'x at 507-08.

Although a fresh review of the evidence could yield a different conclusion, substantial-evidence review does not permit the Court to relitigate a factual matter—only ask if substantial evidence supports the ALJ's conclusion. *Elam*, 348 F.3d at 125. Because substantial evidence does support the ALJ's conclusion, and the ALJ did not fail to address the conflicting evidence of Rininger's physical limitations, the ALJ's finding regarding Goldner's opinion should not be disturbed.

### 2. Sprout's Mental Functional Assessment

Rininger asserts that Sprout is a treating source whose opinions should have received controlling weight; or, alternatively, greater weight than the State Agency's medical consultants' opinions. (ECF No. 16 at 14-5, 17). The Commissioner agrees that Sprout is a treating source, but rejects Rininger's controlling-weight assertion because "the ALJ gave good reasons … for not giving [Sprout's] opinions controlling weight." (ECF No. 19 at 14). For his part, the ALJ found that Sprout's mental functional assessment was "generally inconsistent with the record as a whole, including the treatment records from Dr. Sprout's facility." (ECF No. 12 at 28).

Sprout's medical-source statement is a mental functional assessment modelled after the four *paragraph B* criteria at 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04. Those four criteria represent the functional criteria that the Commissioner uses to evaluate the extent to which a claimant's mental disorder limits their functioning. 20 C.F.R. Part 404, Subpart P, Appendix 1, 112.00(2)(b). They are: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; (4) and adapt or manage oneself. 20 C.F.R. Part 404,

Subpart P, Appendix 1, 112.00(2)(b). Each criterion is ranked by severity: none, mild, moderate, marked, or extreme. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2). A *none* finding means that the claimant is "able to function in this area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(a). A *mild limitation* means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(b). A *moderate limitation* means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(c). A *marked limitation* means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(d). And an *extreme limitation* means that the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(e).

Sprout's mental functional assessment breaks down each of the four criteria into sets of eight sub-questions; each sub-question assesses a facet of work-related functioning, which assists the author in scoring a particular criterion. (ECF No. 12 at 705-06). Sprout opined that Rininger was extremely limited in 22 of the 32 sub-questions and markedly limited in seven others. (ECF No. 12 at 705-06). Sprout opined that Rininger was moderately limited in two sub-questions and mildly limited in only one sub-question. (ECF No. 12 at 705-06). Although Sprout did not summarize her opinion, it is apparent that she rated Rininger as extremely limited in each of the four criteria. (ECF No. 16 at 21).

But, as the ALJ noted, Sprout's regularly maintained treatment notes paint a different picture. (ECF No. 12 at 28). Sprout noted that, on some occasions, Rininger's sleep patterns had

declined or were interrupted (ECF No. 12 at 851, 859, 868, 893); on others, they had improved. (ECF No. 12 at 853, 864, 875, 881, 883, 887, 897). On some occasions, Rininger's hallucinations had marginally increased in frequency (ECF No. 12 at 868, 875); on far more, they had declined or were nominal. (ECF No. 12 at 851, 662, 859, 881, 883, 887, 893, 895, 897). Sprout observed that some of Rininger's symptoms and mannerisms remained constant throughout his treatment. For example, Rininger experienced intermittent paranoia; in nearly each visit note, Rininger spoke at a normal rate, volume, and tone for an adult male; his thoughts were goal directed; his insight and judgment were good; and he was oriented to person, place, and time, but not situation. (ECF No. 12 at 660, 851, 875, 887, 895, 897). Finally, Rininger's concentration was consistently poor. (ECF No. 12 at 660, 851, 875, 887, 895, 897).

Similarly, in all but one record, Sprout noted that Rininger adhered to treatment regimen. When Sprout and Rininger met on January 5, 2017, he had been off of his medications for about a week and a half—he had restarted his regimen just a few days earlier. (ECF No. 12 at 868). Rininger had been unable to acquire his medications from his pharmacy. (ECF No. 12 at 868). He had more mood swings and paranoia, was hearing whispering voices, and had more anxiety. (ECF No. 12 at 868). This episode led Rininger to remark that "being without medicine has made him realize that [his medications are] helpful to him." (ECF No. 12 at 868). And in the two most recent records, Rininger described himself as "doing ok" and "not having as many mood swings," with less medicine-induced irritability. (ECF No. 12 at 895, 897).

When taken together, Sprout's status notes contradict the description of the extremely limited person who, by definition, should not be able to function "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(F)(2)(e)). Rather than depict extreme limitations, they repeatedly show that Rininger spoke at a normal rate,

volume, and tone for an adult male; his thoughts were goal directed; his insight and judgment were good; and he was oriented to person, place, and time. They also show that his medications greatly reduce his auditory and visual hallucinations.[7]

The ALJ summarized these conflicts in his opinion. The ALJ noted that while Rininger "did report some increases in symptomology, he did not require crisis care, emergency room treatment, or psychiatric hospitalization." (ECF No. 12 at 28). He also noted that Rininger's "medication adjustments were generally effective in helping to control his symptoms." (ECF No. 12 at 28). The contradictions between Sprout's opinion and her objective treatment notes cast doubt on Sprout's extreme-limitations finding. If a treating source's opinion conflicts with other substantial evidence in the case record, then it cannot be given controlling weight. 20 C.F.R. § 404.1527(c)(2). Thus, the ALJ properly determined that Sprout's mental functional assessment was not entitled to controlling weight because it conflicts with other objective evidence in the record.

Next, the ALJ must have also considered Sprout's opinion under the six factors at 20 C.F.R. § 404.1527(c), as he was required to do with Goldner's opinion. And as with Goldner's opinion, the ALJ did not expressly analyze the six factors; instead, he concluded that "the record does not support limitations rising to the "marked" or "extreme" levels opined by Dr. Sprout. Accordingly, these opinions are given little weight." (ECF No. 12 at 28).

---

[7] The most severe symptoms in the record stem from a January 5, 2017 visit, during which Rininger reflected on having been without his anti-psychotic medications for about a week and a half. (ECF No. 12 at 868). During that period, Rininger had more mood swings and paranoia, heard whispering voices, and had more anxiety. (ECF No. 12 at 868). This is the only record that reflects marked or severe symptoms. Indeed, Rininger remarked that being without medicine made him realize that should continue his generally successful treatments. (ECF No. 12 at 868).

36

Once again, the ALJ's limited narrative does not require remand because the ALJ's reasoning is apparent. *Kornecky*, 167 F. App'x at 507-08; *Ware*, 2018 WL 1202588, at *5-6. Sprout's opinion does not flow logically from her treatment notes. For years, Sprout's treatment notes captured positive trends in Rininger's mental-health symptoms. But her opinion, which was prepared specifically for Rininger's hearing (ECF No. 12 at 704), noticeably reverses course—and does so without justification. This contradiction factors heavily into the ALJ's decision to give the opinion little weight. (ECF No. 12 at 28). Although the other factors may favor an alternative conclusion, it is not the Court's role on substantial-evidence review to reweigh the evidence; again, the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen*, 800 F.2d 545. Accordingly, the ALJ did not err in apportioning little weight to Sprout's mental functional assessment.

Rininger again asserts that the ALJ cherry picked evidence to support a predetermined conclusion without properly weighing the entirety of the record. (ECF No. 16 at 13). To that end, Rininger notes that

> he has difficulty being around other people… [and he] avoid[s] crowds and most social situations. He often isolates away from others, including his own family member. His wife deals with all of their interactions with the personnel at their daughter's school. [He] is also cognitively limited in that he is unable to write effectively and has trouble with arithmetic other than very basic arithmetic. He further testified that during depressive episodes he can forgo bathing and taking care of his personal hygiene.

(ECF No. 16 at 20-21 (internal citations omitted)). Cherry picking is not a concern with Sprout's opinion, either, because, as discussed above, the ALJ fully noted and considered the conflicting evidence. *Gentry*, 741 F.3d at 723-24. That satisfies his obligation.

Because substantial evidence exists to support the ALJ's conclusion regarding Sprout's medical-source opinion, and the ALJ did not fail to address the conflicting evidence of Rininger's mental limitations, the ALJ's finding regarding Sprout's opinion should not be disturbed.

### 3. Weight Apportioned to the State Agency's Consultants' Opinions

Rininger also contests the ALJ's decision to give the State Agency's medical consultants' opinions partial weight, which he argues is greater weight than the little weight he gave to Goldner's and Sprout's opinions. (ECF No. 16 at 16). As Rininger views the regulations and Sixth Circuit caselaw, "[a] consultant's opinion cannot be afforded greater weight than a treating physician's opinion when the consultant's opinion was based on a review of an incomplete case record." (ECF No. 16 at 17 (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)).

The Commissioner disagrees. He notes that the ALJ, in giving the consultants' opinions only partial weight, complied with the controlling regulations. (ECF No. 19 at 14). The Commissioner's main support for that position is that the ALJ fashioned an RFC that was more limited—thus, more favorable to Rininger's claim—than the consultants' opinions. (ECF No. 19 at 13-14 (citing *Bennett v. Colvin*, No. 1:15-cv-1107, 2016 WL 4430836, at *7 (N.D. Ohio Aug. 22, 2016)). The ALJ expressly did so because the consultants did not review the entire record, which included "new and material evidence warranting changes in … [Rininger's] residual functional capacity." (ECF No. 12 at 28).

Social Security Ruling 96-6p explains that

> Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 CFR 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and

severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

…

[T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or p[s]ychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996). The Sixth Circuit has adopted this analysis. *Blakely*, 581 F.3d at 409. Thus, Rininger is correct that a consultant's opinion, especially one who reviewed only a portion of the ultimate record, should only rarely be given greater weight than a treating source's opinion.

39

But that is not always so. As the Sixth Circuit noted in *Blakely*, an "ALJ's decision to accord greater weight to [a] state agency physician over [a] treating source[ i]s not, by itself, reversible error." 581 F.3d at 409. Instead, the question is whether ALJs "explain the weight given to the [consultants'] opinions in their decisions." SSR 96-6p, at *2. To that end, the regulations require that the ALJ analyze consultants' opinions under the six factors at 20 C.F.R. § 404.1527(c). 20 C.F.R. § 404.1527(f)(1). If the consultants reviewed only a portion of the ultimate record, then there must be "'some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not based on a review of a complete case record.'" *Blakely*, 581 F.3d at 409 (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)).

The ALJ's decision to give at least partial weight to the State Agency's consultants' opinions was proper. The ALJ noted that the consultants "adopted the prior findings" from Rininger's 2014 claim. (ECF No. 12 at 28). He then notes that the consultants did not review the full administrative record; thus, they did not review the "new and material evidence" that the ALJ explained "warrant[ed] changes in the claimant's residual functional capacity." (ECF No. 12 at 28). Accordingly, he gave the consultants partial weight—*i.e.*, their opinions affected his decision only as far as they comported to the record. (ECF No. 12 at 28). And he updated the RFC accordingly. (ECF No. 12 at 28).

The ALJ's decisions concerning the weight to give the opinion evidence are supported by substantial evidence. Goldner is not a treating source as defined by the regulations, and his opinion was inconsistent with objective imaging results in Rininger's medical records. Although Sprout is a treating source, her mental functional assessment materially conflicted with her own objective treating notes, so her opinion is not entitled to controlling weight. And ultimately, substantial

40

evidence supports the ALJ's decision to give the State Agency's consultants' opinions partial weight. Thus, the ALJ did not err in weighing Goldner's, Sprout's, or the consultants' opinions.

Having determined that the ALJ's treatment of the opinion evidence is supported by substantial evidence, the Court must rely on the ALJ's analysis of them in Rininger's merits objections. 42 U.S.C. § 405(g); *Jones*, 336 F.3d at 475. Although it is not fully briefed, Rininger's weight-of-the-evidence argument indirectly challenges the ALJ's RFC finding. As Rininger alludes, if the ALJ had weighed either Goldner's or Sprout's opinions differently—for example, by giving either of them controlling weight—then the RFC would necessarily have to change to account for their more extreme opinions. (ECF No. 16 at 18). But substantial evidence supports apportioning little weight to Goldner's and Sprout's opinions. Since Rininger has not argued that a particular part of the RFC is error notwithstanding the weight accorded to the opinion evidence, it is not necessary to review the RFC in greater detail.[8]

### C.      Listing 12.04

Rininger's second assignment of error asks whether the ALJ erred in not finding that, as a factual matter, Rininger's affective (bipolar) disorder and symptoms qualified him as disabled under Listing 12.04. (ECF No. 16 at 19). This is a Step-3 challenge. Rininger cites two key sources of evidence that he is factually disabled under Listing 12.04: (1) Sprout's functional assessment and treatment notes; and (2) Rininger's own testimony at the hearing. (ECF No. 16 at 19-21).

---

[8] In *Hollon v. Comm'r of Soc. Sec.*, the Sixth Circuit declined to substantively review an argument for which the petitioner had "made little effort to develop … in her brief." 447 F.3d 477, 491 (6th Cir. 2006). The court noted that it "decline[d] to formulate arguments on [the petitioner]'s behalf, or to undertake an open-ended review of the entirety of the administrative record to determine (i) whether it might contain evidence that arguably is inconsistent with the [ALJ's decision, and (ii) if so, whether the [ALJ] sufficiently accounted for this evidence." *Id.* Instead, the court "limit[ed its] consideration to the particular points that [the petitioner] appears to raise…" *Id.* So too here.

Rininger argues that either evidentiary source demonstrates that he is "markedly, or even extremely[,] limited in all fields of mental functioning." (ECF No. 16 at 20).

The Commissioner disagrees, noting that State Agency psychological consultants Kikor and Tangeman both "explicitly found that [Rininger] did not meet or equal" the Listing 12.04 criteria; they concluded that Rininger was, at most, moderately limited. (ECF No. 19 at 9). The Commissioner directs the Court to case law that purports to support the proposition that "a state agency reviewing source's opinion is substantial evidence," on its own, "to support a Step Three finding." (ECF No. 12 at 9 (summarizing in a parenthetical *Wamsley v. Comm'r of Soc. Sec.*, No. 5:18-CV-0269, 2018 WL 6732868, at *3 (N.D. Ohio Nov. 14, 2018)).[9] The Commissioner also argues that the ALJ sufficiently described his Listing 12.04 analysis and, thus, that it is supported by substantial evidence. (ECF No. 19 at 9-10).

The regulations explain the Step-3 listings as impairments for each of the major body systems that the Agency "consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404. 1525(a). The regulations lay out specific criteria for each listing in Appendix 1 to Part 404, Subpart P. If a claimant satisfies the criteria for a particular listing, then the claimant is disabled. 20 C.F.R. § 404.1525(c)(5).

---

[9] *Wamsley* states that "a state agency reviewing source's opinion *is* substantial evidence sufficient to support a Step Three finding." 2018 WL 6732868, at *3 (emphasis in original). *Wamsley* cites *Eiland v. Astrue* in support, but *Eiland* is not so explicit. Instead, *Eiland* says that "the ALJ had before him a record of over 600 pages, with five years of treatment notes and treating physician opinions, *and* he had two opinions from state agency psychologists that found that Plaintiff's impairments did not meet or equal a Listing. Thus, sufficient evidence existed in order for the ALJ to make his decision at Step Three without the need for a medical expert…" *Eiland*, No. 1:10-cv-2436, 2012 WL 359677, at *10 (N.D. Ohio Fe. 2, 2012) (emphasis added). At most, *Eiland* and *Wamsley* support the proposition that a State Agency reviewing source's opinion can contribute substantial evidence, not that it is always substantial evidence on its own.

A Listing 12.04 disability concerns "Depressive, bipolar[,] and related disorders." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00. A claimant can establish a Listing 12.04 disability by meeting paragraphs A[10] and B—or A and C—under the listing. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00. "To satisfy the *paragraph B* criteria, [a claimant's] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(A)(2). The first area of mental functioning—understand, remember, or apply information—"refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(E)(1). The second area—interact with others—"refers to the abilities to relate to and work with supervisors, co-workers, and the public. 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(E)(2). The third area—concentrate, persists, or maintain pace—"refers to the ability to stay on task at a sustained rate." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(E)(3). The final area—adapt or manage oneself—"refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00(E)(4).

The ALJ should review the claimant's record and consider all evidence of impairments "to see if the sum of impairments is medically equivalent to a listed impairment." *Bledsoe v. Barnhart*, No. 04–4531, 2006 WL 229795, at *3 (6th Cir. Jan.31, 2006). An ALJ does not procedurally "err by not spelling out every consideration that went into the step three determination." *Bledsoe*, 2006 WL 229795, at *3. Put another way, "the ALJ's findings of fact [at Step 3] should not be disturbed unless [the Court is] persuaded that his findings are legally insufficient." *Dorton v. Heckler*, 789

---

[10] Neither party has put Rininger's paragraph–A status into question; thus, it is not analyzed here.

F.2d 363, 367 (6th Cir. 1986). In short, "there is no heightened articulation standard [at Step 3] where the ALJ's findings are supported by substantial evidence." *Dorton*, 789 F.2d at 367.

The ALJ determined that Rininger does not meet the Listing 12.04 criteria under either *paragraph B* or *paragraph C*. (ECF No. 12 at 23-24). At *paragraph B*, the ALJ found that Rininger was moderately limited in three of the four criteria: (1) understand, remember, or apply information; (2) interact with others; and (3) concentrate, persists, or maintain pace. (ECF No. 12 at 24). The ALJ found that Rininger was only mildly limited in the final criteria, the ability to adapt or manage oneself. (ECF No. 12 at 24). The ALJ explained his findings as follows:

> The claimant attested that he is able to manage personal care, shops with his wife, and helps with some childcare. He testified that although his wife manages the finances, he could do so, if necessary. While there was a history of diagnosis of borderline intellectual functioning, examinations of record showed no cognitive deficits, with full orientation. He did allege problems relating with others[] but was able to interact with the providers of record[] and gets along with his immediate family members. The record as a whole supports no more than moderate limitations in the mental work-related areas of functioning.

(ECF No. 12 at 24). Thus, the ALJ ultimately found that Rininger's "mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, [so] the 'paragraph B' criteria are not satisfied." (ECF No. 12 at 24).

Rininger's assertion that Sprout's mental functional assessment, on its own, evinces a factual disability under Listing 12.04 is unpersuasive. As discussed above, although Sprout's mental functional assessment rated Rininger as extremely limited in 22 of the 32 sub-questions (and markedly limited in seven others), the ALJ gave it little weight because it conflicted with Sprout's other objective treatment notes, and that decision was supported by substantial evidence. Thus, it does not compel a finding that Rininger was disabled under Listing 12.04.

44

Concerning his testimony, Rininger attacks the ALJ for "selectively parsing the record for evidence that suggest[s] a higher degree of mental functioning" in analyzing Rininger's status under Listing 12.04. (ECF No. 16 at 21). As quoted in the earlier discussion, Rininger points out that he testified about various social and cognitive difficulties during his hearing. (ECF No. 16 at 20-21). Although those points capture parts of Rininger's testimony, Sprout's treatment notes—which are objective medical evidence—capture the other side of the story. As determined above, Sprout's treatment notes demonstrate that Rininger's treatments generally reduced his psychotic symptoms. And, as the ALJ noted, Rininger has been able to interact well with the providers of record and gets along with his immediate family members.

Moreover, parts of Rininger's testimony contradict with his Listing 12.04 argument here. As the ALJ noted, Rininger believes that he could manage his family's finances if he needed to. (ECF No. 12 at 119). He represented that he can largely manage his personal care—he showers about every other day, he can shave himself and brush his teeth (ECF No. 12 at 136), and he can dress himself. (ECF No. 12 at 141). Although Rininger explained that he has gone three or four days without showering during major depressive states (ECF No. 12 at 149), he inconsistently estimated the number of days per month during which he experienced those states. For example, he originally stated that he has more bad days than good days with his anxiety and depression, "probably … five bad days and two/three good days" per week (ECF No. 12 at 130), but later reported that he feels that his depression is severe about "10 to 15 days out of a month, half the month." (ECF No. 12 at 150).

Taken as a whole, the ALJ did not err in finding that Rininger is not disabled under Listing 12.04. Despite Rininger's alternative analysis of the record here, the ALJ's determination is supported by substantial evidence because a reasonable person might accept the ALJ's more

conservative view of Rininger's limitations as adequate support for the ALJ's conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). That is particularly true given that the ALJ was in the best position to consider Rininger's in-person testimony—he had "the opportunity, which … [a reviewing court] do[es] not, of observing a witness's demeanor when testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Because it is supported by substantial evidence, the ALJ's Step-3 finding is not error. Thus, it should be affirmed.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Rininger's application for disability-insurance benefits and supplemental-security income be AFFIRMED.

DATED: 10/26/2020

*Carmen Henderson*
_____
Carmen E. Henderson
United States Magistrate Judge

_____

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); see also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).